2002 WY 85

**RUBY DRILLING CO., INC.,**
**Appellant (Plaintiff),**

v.

**DUNCAN OIL COMPANY, INC.,**
**Appellee (Defendant).**

No. 01–72.

Supreme Court of Wyoming.

June 5, 2002.

Carol Seeger of Carter Law Office, Gillette, Wyoming, Representing Appellant.

Tom C. Toner of Yonkee & Toner, Sheridan, Wyoming, Representing Appellee.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1]   Duncan Oil Company, Inc. (Duncan) paid Ruby Drilling Co., Inc. (Ruby) $23 per foot in advance to drill a 6,000–foot oil well consistent with the contract Ruby drafted.

Ruby drilled the hole in such a manner that it deviated from vertical so much it was unusable. Duncan hired specialized contractors to correct the deviation and complete the well. Thereafter, Ruby sued Duncan for breach of contract claiming additional money was owed because the contract terms changed from per foot to per day cost when Duncan hired the other contractors. Duncan counterclaimed for the costs to complete the well. After a bench trial, the trial court held Ruby breached the contract and Duncan was entitled damages. We affirm.

## ISSUES

[¶ 2] We rearticulate the issues in the following manner:

1. Did the trial court properly construe the written drilling agreement to be a footage contract with the specifications based on the customary industry usage of the terms?

2. Did the trial court improperly limit Ruby's expert witness from testifying regarding changes to the Ruby drilling contract?

3. Was the trial court's decision contrary to the clear weight of the evidence?

4. Did the trial court err as a matter of law and contrary to the clear weight of the evidence in determining damages?

## FACTS

[¶ 3] Ruby had been drilling water and oil wells for fifty-six years. Duncan had used Ruby's services in the past to drill several shallow coalbed methane water wells. In the fall of 1997, Duncan asked Ruby whether, in the event the company had the proper equipment, it would be interested in bidding on a 6,000-foot oil well to be drilled in the Kaycee area. Ruby advised Duncan that it had a suitable rig and would like to bid the contract. Ruby also represented it had drilled a number of water wells around Kaycee and was familiar with the area but failed to tell Duncan it had never before drilled a well as deep as 6,000 feet.

[¶ 4] Ruby proposed to drill the well for $23 per foot on a footage contract with additional miscellaneous costs including per diem for mobilization/demobilization and hourly rates for specified service work. Duncan accepted the proposal and requested Ruby send a contract with an invoice to expedite the project and allow the cost to fall within Duncan's 1997 budget. On December 29, 1997, Duncan signed the contract and sent Ruby a check for $141,200 as an advance payment.

[¶ 5] On January 1, 1998, Ruby moved a drilling rig to the well location and commenced work. On January 14, 1998, at approximately 510 feet, a straight hole survey showed five degrees deviation from vertical. A straight hole survey relates the degree of deviation from vertical but does not reflect the direction of the deviation. The industry standard provides deviation should not exceed one degree per thousand feet with a maximum deviation at total depth of not more than five to six degrees. Ruby advised Duncan that the reading was probably a mistake and continued to drill. Ruby conducted three more surveys as the well was drilled deeper which indicated increased deviation. By January 16, 1998, the well reached 1,780 feet, and the survey reflected eight degrees' deviation. Had drilling continued in this manner, the bottom hole would have been nearly 1,078 feet from the surface location and on another lease. Duncan told Ruby to stop drilling until Baker Hughes Inteq, a directional survey company, could evaluate the deviation. Ruby did not stop drilling until it reached 2,200 feet. In order to correct the severe deviation, Baker Hughes recommended the well be plugged back to the surface pipe, the well bore be filled with cement, and directional equipment be used to drill vertically into the formation.

[¶ 6] Duncan offered Ruby an opportunity to correct the deviation, but Ruby said all it could do was drill in the same manner that had led to the deviation in the first instance. Duncan hired Baker Hughes to correct the deviation, and Ruby remained on site and assisted. The project continued to experience difficulties and delays caused by Ruby's inadequate equipment and equipment failures. Baker Hughes left the site when the well reached approximately 5,081 feet because the deviation had been resolved, and

Ruby completed the well by conventional drilling to 5,950 feet. Ruby had anticipated the project would take ten to twelve days, but, due to the various problems, it took forty-five days.

[¶ 7] After completion in February of 1998, the parties had no additional contact until April of 1998 when Ruby sent two invoices to Duncan. One invoice was computed on a straight day work basis for forty-five days, totaling $114,290 ($255,490 less the original $141,200 advance payment), and one was computed on a combined footage/day work basis for thirty-seven days, totaling $119,003 ($260,203 less the original $141,200 advance payment) to provide Duncan the option of paying for either straight day work or combined footage/day work. Duncan refused to pay and advised Ruby the latter owed Duncan for the expenses incurred to correct the well deviation.

[¶ 8] In July 1999, Ruby filed suit against Duncan for breach of contract and damages of $119,003 plus interest at eighteen percent per annum. Duncan answered and counterclaimed for breach of contract and damages of $181,311.01. Subsequent to a bench trial, the court found Ruby had breached the footage contract by failing to drill the well in a workmanlike manner, the footage contract was not converted by the parties' actions into a day work contract, and Duncan was entitled to a judgment of $155,211 for the costs it incurred to correct and complete the well. Ruby appealed.

## STANDARD OF REVIEW

[¶ 9] We are required to review the trial court's construction of the drilling contract and its factual determination that Ruby breached the terms of that contract.

"When a trial court in a bench trial makes express findings of fact and conclusions of law, we review the factual determinations under a clearly erroneous standard and the legal conclusions *de novo.*" *Rennard v. Vollmar,* 977 P.2d 1277, 1279 (Wyo. 1999). This court does not weigh the evidence *de novo;* therefore, findings may not be set aside because we would have reached a different result. Moreover, the appellant bears the burden of persuading the appellate court that the finding is erroneous.

*Schlesinger v. Woodcock,* 2001 WY 120, ¶ 13, 35 P.3d 1232, ¶ 13 (Wyo.2001) (some citations omitted); *see also Polo Ranch Company v. City of Cheyenne,* 969 P.2d 132, 136 (Wyo. 1998).

Normally, the construction and interpretation of an unambiguous contract is a matter for the court to address as a question of law. *Garcia v. UniWyo Federal Credit Union,* 920 P.2d 642, 645 (Wyo.1996); *Feather v. State Farm Fire and Cas.,* 872 P.2d 1177, 1180 (Wyo.1994); *Mobil Coal Producing, Inc. v. Parks,* 704 P.2d 702, 707 (Wyo.1985).

*Ormsby v. Dana Kepner Co. of Wyo. Inc.,* 997 P.2d 465, 469 (Wyo.2000). Further, we must assume the evidence in favor of the successful party is true. We exclude any consideration of the evidence presented by the unsuccessful party that conflicts with the successful party's evidence, and we afford to the successful party's evidence every favorable inference that may be reasonably and fairly drawn from it. *Daley v. Wenzel,* 2001 WY 80, ¶ 24, 30 P.3d 547, ¶ 24 (Wyo.2001); *Turcq v. Shanahan,* 950 P.2d 47, 51–52 (Wyo. 1997); *Richardson v. Schaub,* 796 P.2d 1304, 1309–10 (Wyo.1990).

## DISCUSSION

### A. Contract Construction

[¶ 10] The contact language at the heart of this dispute provides:

*We hereby submit specifications and estimates for the drilling of a well at $23.00 per ft. for drilling and/or $200.00 per hour for service work.* Casing will be _____ in. diameter for surface, all the way, and _____ in. diameter for other if necessary.

---

We hereby submit specifications and estimates for the drilling [in] accordance with the above specifications, for the estimated footage

or to ample amount of water. Payment to be made after completion of job and due upon receipt of our billing. If payment is not made within a reasonable time and the account be placed in collector's or attorney's hands for collection, all costs of collection including reasonable attorney fees will be added to our total bill, plus 18% on past due accounts.

| | |
|---|---|
| Mobilization & Demobilization | $3,000.00 |
| Per Diem | $300.00 per day |

| | |
|---|---|
| Hour Time will include: | Rig time running straight hole |
| | Logging |
| | Running casing |
| | Drill stem tests |
| | Plug & abandon |

All material is guaranteed to be as specified. *All work to be completed in a workmanlike manner according to standard practices. Any alteration or deviation from above specifications involving extra costs, will be executed only upon written orders, and will become an extra charge over and above the estimate.* All agreements contingent upon strikes, accidents or delays beyond our control. Our workers are fully covered by Workmen's Compensation Insurance.

(Emphasis added.)

[¶ 11] The parties agree Ruby drafted the agreement as a footage contract. A significant difference exists in responsibilities and risk apportioned between the operator and the drilling contractor under a day work contract as opposed to a footage contract.

(2) Day work contract.

Under the day work contract, an operator engages a contractor to drill a well at a specified location to a specified depth and agrees to pay the contractor at a specified rate per day. Accordingly, the operator and not the contractor, takes the risk of added expense because of delays and difficulties encountered in drilling. . . .

(3) Footage contract.

■■■ Under the footage contract, the specifications of the well would remain the same, but the operator agrees to pay the contractor at a specified rate per foot drilled. Accordingly, the contractor and not the operator, takes the risk of added expense because of delays and difficulties in drilling.

2 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 19A.5(b) at 95 (1989). In this footage contract, Ruby, the contractor, and not Duncan, the operator, took the risk of added expense because of delays and difficul-

ties in drilling. Despite the lack of a written order as the contract required, Ruby argues the original footage contract was modified into a day work contract because Duncan failed to include well specifications in the original agreement—particularly a straight hole/minimal deviation requirement—and took control of the project when it hired Baker Hughes.

This court has previously acknowledged that the parties to a written agreement may orally waive or modify their rights under the agreement. We have further indicated that an oral modification of a written agreement may be possible even when the agreement contains a no-unwritten-modification clause. The party asserting that a written agreement was modified by the subsequent expressions or conduct of the parties must prove so by clear and convincing evidence. The question of whether the alleged modification of the written agreement has been proved by the required quantum of evidence is one to be decided by the trier of fact. We will not reverse the decision of the trier of fact unless that decision is clearly erroneous or contrary to the great weight of the evidence.

*Wolin v. Walker*, 830 P.2d 429, 431–32 (Wyo. 1992) (citations omitted). Clear and convinc-

ing evidence is the "kind of proof which would persuade a trier of fact that the truth of the contention is highly probable." *MacGuire v. Harriscope Broadcasting Co.,* 612 P.2d 830, 839 (Wyo.1980); *see also Dorr v. Wyoming Board of Certified Public Accountants,* 2001 WY 37, ¶ 8, 21 P.3d 735, ¶ 8 (Wyo.2001); *Meyer v. Norman,* 780 P.2d 283, 291 (Wyo.1989).

[¶ 12] The trial court made the following findings and conclusions relevant to this issue:

4. ***Exhibit A is a "footage" contract*** that specifies primary compensation to Ruby was to be determined at the rate of $23.00 per foot of well bore. (The contract also allows other miscellaneous compensation.) ***There was no agreement by words, writings or actions to change the method of compensation;***

5. Duncan paid Ruby, in advance, the invoice total which listed the per foot charge and some other estimated charges;

6. Ruby did not have sufficient equipment under industry custom and standard practice to drill a 6,000 foot well during the drilling project at issue. This deficiency was a breach of contract. Items Ruby lacked include, but are not limited to, the following: (a) a blowout preventer; (b) about 1,300 feet of drill pipe (it is dangerous and against industry custom/usage to drill with tubing at these depths); (c) bottleneck elevators to use on bottleneck drill pipe (also the elevators were not rated to carry the drill string weight required);

7. Ruby did not otherwise perform in a workmanlike manner. The main example was the failure to drill as close to vertical as possible. This failure was a breach of contract;

8. The drilling contract herein required a well bore that was as close to vertical as possible;

9. Duncan notified Ruby of deficiencies described above prior to renting equipment and prior to hiring subcontractors. Ruby's breach of contract; failure to correct deficiencies; and failure to suggest alternatives required Duncan to rent equipment and hire subcontractors in or-

der to complete the well under industry standards;

10. Any "supervision and/or control" exercised by Duncan over the drilling process was by tacit agreement with Ruby. Ruby voiced no contemporaneous objections to Duncan decisions;

    . . . .

12. When Duncan realized Ruby did not begin this well as close to vertical as was possible, it gave Ruby an opportunity to correct. Ruby could not make necessary corrections without additional equipment and personnel. When Ruby failed or refused to correct, arguably Duncan could have declared a breach and dismissed Ruby from the site. However, by remaining on location and using some of its equipment, Ruby was given opportunities to mitigate damages[.]

(Emphasis added.) The trial court determined the contract was not ambiguous and Ruby failed to prove an unwritten modification of the contract by clear and convincing evidence. We are persuaded this is the correct result.

[¶ 13] Ruby drafted this agreement, which was a footage contract with additional miscellaneous expenses. The terms also dictated the well would be completed in a workmanlike manner according to standard practices and any change of the specifications required written agreement. The parties agree no written agreement to modify existed.

[¶ 14] Ruby claims the contract did not require the drilling of a straight hole, and all the proper equipment was available to drill the hole correctly in the conventional manner. The trial transcript discloses Jesse Dale Ruby, owner, operator, and driller for Ruby, testified in an implausible and often internally inconsistent manner. He denied knowing the standard practices in the oil well drilling industry stating he was not a part of that industry despite previously testifying he had fifty-six years of drilling experience. He denied he was required to drill a straight hole but acknowledged, by the contract terms, his crew was to periodically run straight hole surveys to determine the amount of deviation. He testified Ruby in-

tended to drill the hole as straight as possible but also claimed it had no contractual obligation to do so. Mr. Ruby denied any knowledge of or requirement to abide by the Wyoming Oil and Gas Conservation Commission's rules and regulations with regard to maintaining a practical minimum deviation in all oil and gas wells drilled. *See* Wyoming Oil and Gas Conservation Commission Rules & Regulations ch. 3, § 24 (Sept. 3, 1996). He contended that Ruby was not bound to observe any requirement or standard not explicitly spelled out in the contract.

[¶ 15] This argument belies both the contract language and the applicable case law. The contract specifically provided all work was to be completed according to standard practices. It is reasonable to infer that, when one is drilling an oil well and the contract specifies standard practices, the standard practices referred to are those of the oil well drilling industry. When a usage is common to an industry, failure to negate the application of such usage engenders an assumption it was intended to apply, and, if the person contracting wishes to escape the force thereof, he should except such custom from the contract. *Valentine v. Ormsbee Exploration Corporation*, 665 P.2d 452, 458 (Wyo.1983). " 'It is well settled that parties who contract on a subject matter concerning which known usages prevail, incorporate such usages by implication into their agreements, if nothing is said to the contrary.' " *Id.* (quoting *Hostetter v. Park*, 137 U.S. 30, 40, 11 S.Ct. 1, 34 L.Ed. 568 (1890)). In this case, Ruby made the "standard practices" of the industry an express term of the contract.

[¶ 16] The evidence clearly established drilling a straight hole was the standard industry practice. Mr. Ruby equivocated saying he did not even know what the word "straight" meant. However, his own expert witness conceded the industry standard calls for the contractor to drill the well as close to vertical as possible. Mr. Ruby advised the expert he did nothing to control the deviation because he had done his job as long as he drilled the well to 6,000 feet even if the bottom hole was a quarter of a mile away from the surface location.

[¶ 17] Viewed in the light most favorable to Duncan, the evidence established Duncan offered Ruby an opportunity to correct the problem when the deviation was determined to be serious. Mr. Ruby initially testified he was denied this option but later stated he told Duncan that all his company could do was continue drilling in the same manner holding weight off the drill bit in an effort to minimize further deviation. Additionally, Mr. Ruby acknowledged he never communicated with Duncan about modification of the footage contract to a day work contract until he sent the two invoices over a month after the well was completed.

[¶ 18] "We have ... indicated the necessity for parties to follow the terms and conditions of contracts entered into by them." *State Surety Company v. Lamb Construction Company*, 625 P.2d 184, 194 (Wyo.1981). We conclude Ruby failed to prove modification of the contract to a day work contract by clear and convincing evidence. The trial court properly found the contract was a footage contract because the terms were unambiguous, no modification existed, the contract specified standard practices of the industry should be followed thereby requiring the drilling of a straight hole, and Ruby rejected the opportunity to correct the deviation problems.

## B. Expert Witness

[¶ 19] Ruby argues that the trial court improperly precluded its expert witness from testifying regarding industry custom as it pertains to changes from footage to day work contracts. On the contrary, the court did receive approximately five pages of testimony on this topic. It did not, however, permit the expert to opine as to whether the Ruby footage contract changed to a day work contract concluding that was a question of law. In this regard, the court advised Ruby's attorney: "Counsel, it is something I'm sure you're aware of; but the witness offered an opinion as to whether or not *this footage contract switched to a day contract;* and that's objectionable. That is an opinion that the Court would not consider as a ruling on the law." (Emphasis added.)

[¶ 20] During the course of the discussion, Ruby's counsel clarified his intent stating, "I guess I'm not calling on [the expert] to tell you what the contract is, just that this sort of an arrangement between the parties is customary." The trial court ultimately responded: "You've mentioned to me the limited purpose for which you've elicited that opinion, and I'm satisfied with that. And I just wanted us to be on the same page in terms of the law before the witness sat down." Contrary to Ruby's arguments, the trial court did allow the expert's testimony for the limited purposes for which its counsel offered it. "Rulings on the admissibility of evidence are within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of a clear abuse of discretion." *English v. State*, 982 P.2d 139, 143 (Wyo.1999). We conclude no abuse of discretion has been established.

[¶ 21] Ruby also asserts the court improperly limited the expert's opinion as to inclusion of deviation requirements in drilling contracts. Our review indicates the attorney was actually asking the expert to give his opinion as to which party should have included a deviation clause in the contract. The court expressed its concern the information was speculative and of questionable relevance as there was no deviation clause in the contract.

> "[I]n the absence of statutory authority mandating admission of the expert testimony, the district court's decision to admit or reject such testimony is an evidentiary ruling committed to its discretion." *Witt* [*v. State*], 892 P.2d [132,] 137 [ (Wyo. 1995) ] (citing *Price v. State*, 807 P.2d 909, 913 (Wyo.1991)). We do not disturb a trial court's evidentiary ruling absent a clear abuse of discretion.

*Duran v. State* 990 P.2d 1005, 1009 (Wyo. 1999). Ruby has not advised this court of any statutory authority mandating admission of this particular type of expert testimony.

[¶ 22] Ruby relies on *Samson Resources Company v. Quarles Drilling Company*, 783 P.2d 974, 977 (Okla.Ct.App.1989). The *Samson Resources* case involved a drilling contract with an explicit modification clause governing conditions which would trigger a change from a footage to a day work contract. The *Samson Resources* trial court excluded expert testimony on the industry custom and usage regarding notice of such a change intended to apprise the contracting parties of a modification of the contract from footage to day work. The *Samson Resources* appellate court found the industry evidence was relevant to proper construction of the contract. We agree with this result and point out the trial court in the appeal before us permitted testimony regarding industry custom and usage. However, the *Samson Resources* case does not support Ruby's position that its expert should have been permitted to testify as to the proper contract construction or which party he believed was obligated to ensure inclusion of specific clauses in the contract. Here, the trial court was absolutely correct and fully within its broad discretion when it precluded the attempt to have Ruby's expert witness construe the contract. Contract construction is a question of law and solely within the court's province.

**C.  Clear Weight of the Evidence**

[¶ 23] Ruby contends the trial court's decision is contrary to the clear weight of the evidence. We do not agree. Duncan presented overwhelming evidence through its witnesses, including its expert witness, establishing Ruby's breach of contract. However, it is most telling that the evidence presented by Ruby supported the trial court's conclusions. As noted above, Mr. Ruby testified in a less than convincing fashion denying knowledge of industry practices, the Wyoming Oil and Gas Conservation Commission's rules and regulations, and even the duty to drill a straight hole. He denied knowing deviation could be a problem in this location despite having drilled a number of wells near Kaycee and knowing it is "crooked hole" country. Mr. Ruby also testified (a) retipped, used drill bits were employed but there was no real difference between them and new bits although there is approximately a $7,500 price differential; (b) the elevators were malfunctioning because they were the wrong type for the drill pipe and should have been exchanged before Duncan had to rent

replacements; (c) Ruby had only 4,700 feet of drill pipe, the rest being tubing, although he originally testified it had 6,000 feet of pipe on site; (d) he was unfamiliar with stabilizers and did not know it was equipment used to minimize deviation; (e) although Ruby usually took deviation surveys every 100 feet, on this well it did not make the first check until the depth was over 500 feet; and (f) despite having drafted the contract and used it more than 100 times, he did not know the terms and specifically did not know any modification required a written order.

[¶ 24] Ruby's own expert witness acknowledged (1) a driller must abide by the Wyoming Oil and Gas Conservation Commission's rules and regulations in order to drill in a workmanlike manner; (2) Mr. Ruby advised him nothing had been done to prevent the well from deviating; (3) it is customary in the industry, even if there is no deviation clause in the contract, that the contractor agrees to drill the well as close to vertical as possible; (4) the drilling records did not support Mr. Ruby's contention that weight was taken off the drill bit to control deviation and the records actually indicated the weight was increased; and (5) a stabilizer is commonly used in the industry to minimize deviation.

[¶ 25] Clint Ruby, Mr. Ruby's nephew and a driller on the well project, also testified the crew tried to drill the well straight "[b]e-

cause you always try to drill a straight hole"; however, the only technique he knew to control deviation was lifting weight off the drill bit. He also acknowledged that ten hours of work on a pump were required because his crew had crossed the lines; other significant repairs or replacements were required due to the failure of Ruby's equipment such as the drill line, clutch, duplex mud pump, and light plant; and the loss of a core in the well hole required five days to remove it. We "accept the evidence of the prevailing party as true. We will not disturb the trier of fact's findings unless the findings are so totally in conflict with the great weight of the evidence that they may be properly categorized as irrational." *Agar v. Kysar*, 628 P.2d 1350, 1353 (Wyo.1981) (citation omitted); *see also Valentine*, 665 P.2d at 456; *Sagebrush Development, Inc. v. Moehrke*, 604 P.2d 198, 200 (Wyo.1979). In light of this standard, we have compared the trial court's findings with the evidence and conclude the decision is completely reflective of and supported by the record.

### D. Damages

[¶ 26] Ruby asserts the trial court erred as a matter of law in computing the damages and the evidence did not support the damages. The relevant findings and conclusions are:

11. The measure of damages for breach of an obligation to drill an oil/gas well is the cost of completion;

. . .

13. Actual expenditures of completing this well were:

| | | |
|---|---|---:|
| a. | Ex. Y | $181,311.00 |
| b. | Ex. C Duncan pd to Ruby | 141,200.00 |
| | TOTAL | $322,511.00 |

14. Pursuant to the contract Duncan owes Ruby the following:

| | | |
|---|---|---:|
| a. | $23.00 × 6,000 feet | $138,000.00 |
| b. | $300.00 × 45 days | 13,500.00 |
| c. | Mobilization | 3,000.00 |
| d. | $200.00 × 64 hours (misc) | 12,800.00* |
| | TOTAL | $167,300.00 |

* Ruby did not present testimony claiming a precise number of hours under this contract provision (example: time re casing). However, Clint Ruby testimony provid-

ed proof by a preponderance that at least 64 hours of work was expended and deserves compensation under this line item (43 hrs on rental pump # 1; 31 hrs on rental pump # 2; minus 10 hrs attributed to Ruby crossing lines).

15. Duncan is entitled to Judgment against Ruby in the sum of $155,211.00.

The general measure of damages for breach of contract is the amount that is sufficient to compensate the injured party for the loss which full performance of the contract would have prevented or the breach of it has entailed. *Zitterkopf v. Roussalis,* 546 P.2d 436, 438 (Wyo.1976).

[¶ 27] Ruby's whole damages argument rests on the presumption it did not breach the footage contract. All the costs Ruby seeks compensation for are directly attributable to the company's failure in the first place to drill the well in a workmanlike manner with adequate and proper equipment pursuant to standard practices. As an example, Ruby maintains the original estimate of sixteen hours of service time was grossly understated given the length of the project. It was, of course, a gross underestimate because Ruby's failure to perform in a workmanlike manner made an additional month necessary to repair and complete the well. Ruby also contends it waited fifty-one hours for the directional drillers to complete surveys. However, but for Ruby's breach of contract, directional drillers would not have been required.

[¶ 28] In fact, the trial court afforded Ruby significant credit in calculating Duncan's damages. It permitted $23 for 6,000 feet when at best Ruby drilled 3,150 feet, and perhaps it more accurately drilled only 1,550 feet once Baker Hughes filled the bore with concrete and redrilled it. In addition, the trial court credited Ruby with forty-five days of per diem at $300 per day. This certainly appears to be a generous computation as Ruby's actions necessitated the extension of the project.

[¶ 29] Damages are factual findings which we do not reverse unless they are clearly erroneous. *Cross v. Berg Lumber Company,* 7 P.3d 922, 928 (Wyo.2000). The record supports the trial court's damages award, and we cannot conclude the award was clearly erroneous.

[¶ 30] Affirmed.