# THE SUPREME COURT, STATE OF WYOMING

## 2024 WY 98

APRIL TERM, A.D. 2024

September 13, 2024

JAMES F. CROUCH; MELISA M.
CROUCH; and CROUCH REVOCABLE
TRUST dated August 17, 2016,

Appellants
(Defendants),

v.

S-23-0283

KERRY COOPER; JEANIE COOPER; and
DACE COOPER,

Appellees
(Plaintiffs).

*Appeal from the District Court of Fremont County*
*The Honorable Jason M. Conder, Judge*

*Representing Appellant:*

Joel M. Vincent and Alexandria G. Zafonte of Vincent & Zafonte, LLC, Riverton, Wyoming. Argument by Ms. Zafonte.

*Representing Appellee:*

Vance Countryman of Countryman Law, P.C., Lander, Wyoming. Argument by Mr. Countryman.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

**NOTICE:** This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FENN, Justice.**

[¶1]   Kerry and Jeanie Cooper (the Coopers) entered into a five-year lease agreement (Lease) with James and Melisa Crouch (the Crouches).  The Crouches agreed to lease their farmland to the Coopers to pasture cattle and grow crops for feed.  More than a year before it was set to expire, the Crouches terminated the Lease.  The Coopers filed suit against the Crouches for breach of contract.  The district court found the Crouches breached the Lease by failing to provide the Coopers with adequate notice of default and an opportunity to cure, as required under the terms of the Lease.  The district court awarded the Coopers $153,772.05 in damages.  On appeal, the Crouches claim they provided the required notice and an opportunity to cure, and they challenge the district court's award of damages.  We affirm but remand with instructions for the district court to correct the damages award.

## ISSUES

[¶2]   The Crouches raise five issues on appeal.  We re-phrase them as the following four issues:

> I.   Did the district court err when it found the Crouches breached the Lease by failing to provide the Coopers with adequate notice and an opportunity to cure as required under the terms of the Lease?
>
> II.   Did the district court err when it considered the Crouches' first-to-breach affirmative defense and found the Coopers did not materially breach the Lease?
>
> III.  Did the district court commit clear error when it awarded the Coopers $153,772.05 in damages?
>
> IV.  Did the district court commit clear error when it reduced the Coopers' award by $24,650.35 for their failure to mitigate damages?

## FACTS

[¶3]   In February 2017, James and Melisa Crouch, co-trustees and successors of the Crouch Revocable Trust, entered into a five-year lease agreement with Kerry and Jeanie Cooper,[1] effective from February 15, 2017, to February 15, 2022.  The Crouches agreed to

---

[1] Dace Cooper is listed as a tenant on the Lease.  Dace is Jeanie and Kerry Cooper's son.  Although he is listed as a tenant, the copy of the Lease does not contain his signature, and he was not included on the

1

lease 184 irrigated acres of farmland to the Coopers for grazing cattle and growing hay, corn, barley, oats, or other agricultural products to feed the cattle at a rate of $18,400.00 each year. Mr. Crouch drafted the Lease and included clauses to ensure the Coopers properly cared for his property and equipment. In particular, the Lease provided:

> 4. Tenant agrees to employ standard best management practices. The lease shall not be considered to be in default if weather or other circumstances prevent timely practices or harvesting. This includes fertilizing the irrigated acres as determined appropriate by the tenant, maintaining and filling the pivot tracks as needed, and replacing and repairing the gated pipe to the condition as at the start of the lease. Tenant may sub-lease the aftermath if so desired, but not pasture large horse herds such as the Mantle horses.
>
> 5. Tenants are to pu[m]p out buried pipelines and winterize the pumps and irrigation equipment at the end of the irrigation season. Landowner agrees to pay all taxes and irrigation water fees on the farms. Landowner agrees to provide all materials for fence repairs if tenant supplies labor for the repairs. Owner will have new bearings put in Portlock pivot pump and have pump electric armature cooked at Cowboy Electric in Mills, Wyoming, before the start of the irrigation season. Owner will provide one spare pivot tire and wheel and one remanufactured planetary drive for the TL pivots. Two five gallon buckets of pivot oil will be provided for the pivots by the landowner at start of the first season.
>
> 6. Prohibited uses: None.
>
> 7. The terms of the lease may be amended by mutual consent of all parties as needed.
>
> 8. Default of any of the above provisions by either party may be cured upon written notice by the other party within 90 days of receipt of such notice. . . .

[¶4]    The Coopers pastured approximately 300 head of cattle on the leased property from mid-November to mid-February. In mid-February, the Coopers moved the cattle to other

---

amendment to the Lease. Accordingly, when we refer to the Coopers, we are just referring to Jeanie and Kerry Cooper. We will refer to Dace Cooper by his first name and, when necessary, the first name of the other parties to avoid any confusion.

2

property where they stayed until May 8th. To feed their cattle, the Coopers paid for and planted seed to grow barley and alfalfa hay on the leased property. The Coopers fed their cattle approximately 600 bales of hay each year, which was grown on the leased property.

[¶5]    The Coopers gave their son, Dace, any hay produced in excess of the 600 bales. The Coopers gave Dace this excess hay to sell in exchange for his labor and the use of his farming equipment on the leased property. Dace provided labor and used his equipment to plow the fields, cut and bale the hay, and help feed his parents' cattle. Initially, the Coopers did not produce the necessary 600 bales of hay to feed their cattle, so Dace did not receive any excess hay for the first couple of years. However, by the third and fourth year, the Coopers produced more than 600 bales, and Dace received and sold the excess hay.

[¶6]    During the early part of the Lease, the Coopers made improvements to the leased land. These improvements included leveling the fields and re-digging, extending and changing the direction of the corrugated fields to solve problems with drainage, accumulation of water, and wastewater. The Coopers used a corrugate farming technique to form or shape the field into alternating ridges and grooves to direct the water to run straight across the field or to alter the direction of the flow of water to other areas. *Corrugate*, Merriam Webster, https://www.merriam-webster.com/dictionary/corrugate (last visited August 7, 2024). To help with the water issues, they removed one ditch and dug out and cleaned the remaining ditches. Dace also moved an irrigation pipe to get water to the parts of the field that were not getting any irrigation.

[¶7]    In 2018, the parties amended the Lease by adding an additional 22.1 acres to the land the Coopers farmed, increasing the Coopers' payment to $20,610.00, and adding additional conditions. James Crouch drafted the amendment and added the following conditions:

> Lease Conditions:
>
> The two center pivots on the farms are both of TL manufacture and operate utilizing a hydraulic drive system. The pivots need to be maintained in good working order and may not be modified to electric drive. The farms have cement and concrete lined irrigation ditches that need to be maintained and preserved. At this time we see no reason to change or modify these ditches as they are at present. Any significant change to fencing, irrigating, or the use or location of gated pipe needs approval by the landowner. Fence removal or new fencing location needs to be defined on a map or aerial photo with fence to be removed as well as new fence to be constructed illustrated before the work is approved and started. Any lands that the tenants chose to irrigate that does not have adjudicated water

3

rights does so at their own risk and is responsible for any consequences that may occur.

[¶8]    In November 2020, the Crouches' attorney sent the Coopers and Dace a letter stating the Crouches were terminating the Lease, effective February 15, 2021.  The Crouches indicated they were terminating the Lease because the Coopers breached "the most essential term[] of the lease" by failing to "employ standard best management practices." They alleged in their letter:

> You have failed to employ such practices as evidenced by your failure to apply irrigation water regularly and adequately to those lands within the lease premises which have adjudicated water rights.  Ultimately failing to apply irrigation water by way of a center pivot system to one of the fields for the last twenty days of the 2020 irrigation season.  You have furthered failed to meet the standard by the placing irrigation pipe on areas contiguous with lands adjudicated as having irrigation rights, but which have not been adjudicated as having such rights.  Placing pipe on such lands and delivering water to them is in violation of the federal statutes which provide for Midvale delivering water to members of the Irrigation District.  In addition, you have not applied fertilizer or herbicide in accord with best management practices.  Finally, your failure to properly repair sprinkler machinery in a timely manner has led to the inability to properly irrigate and farm the property and is another violation of best farming practice.

The Crouches indicated that should the Coopers or Dace "have questions concerning this matter [to] direct them to [their attorney]."

[¶9]    Kerry Cooper called the Crouches' attorney and explained they "needed to work something out [for the Coopers] to keep [the Lease] the [last] year, because with cows [they] are planning a year in advance for feed and pasture and everything, and at the minimum, a lot of times [they] are trying to plan two years in advance."  Kerry explained to the attorney it was short notice to terminate the Lease because it would be impossible to find anything else for feed and pasture for their cattle.  In response, the attorney told Kerry to consult with their own attorney.  The Coopers hired an attorney and responded by letter stating they found nothing in the November 2020 letter that justified terminating the Lease. They also enclosed the lease payment for the first half of 2021.

[¶10]  The Crouches responded via a letter on February 12, 2021, stating they gave the Coopers "ninety days advance notice of their termination of the lease which is effective 2-15-2021."  They returned the Coopers' payment, and their counsel stated: "As noted in my

4

earlier letter to the Coopers terminating the lease, they are permitted to leave their cattle on the pasture until March 31, 2021."

[¶11]   After the Crouches terminated the Lease, the Coopers found a small pasture for their cattle and purchased hay, straw, cornstalk, and supplements to feed their cattle.  The Coopers purchased the feed and supplements because they no longer had their crop from the Crouches' property to rely on for feed.  The Crouches entered into a new lease agreement with a different tenant in the spring of 2021.  That same summer, the new tenant and the Crouches farmed the alfalfa fields the Coopers had newly planted and sold the hay.

[¶12]   On August 30, 2021, the Coopers and Dace filed suit against the Crouches for breach of contract seeking damages for the cost of purchasing hay to feed their cattle and for the lost income from selling the excess hay.  The Crouches argued the Coopers defaulted on the Lease, failed to cure their default after they were given notice on November 11, 2020, and failed to mitigate their damages.  The district court held a three-day bench trial beginning on June 28, 2023, and found the Crouches breached the Lease "by terminating the agreement without both giving written notice and providing 90 days to cure any deficiency."  The district court found the Coopers lost the use of the land to pasture and feed their cattle, and that they were unable to grow hay during the summer of 2021 to feed their cattle and sell for a profit because of the Crouches' breach.  It awarded the Coopers damages in the amount of $153,772.05.  The Crouches timely appealed.

## STANDARD OF REVIEW

[¶13]   We apply the following standard when we review a district court's factual findings following a bench trial:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict.  While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record.  Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail reweighing disputed evidence.  Findings of fact will not be set aside unless they are clearly erroneous.  A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  In considering a trial court's factual findings, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.  We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings

5

unless they are unsupported by the record or erroneous as a
matter of law.

*Koch v. Gray*, 2024 WY 41, ¶ 10, 546 P.3d 1095, 1099 (Wyo. 2024) (quoting *Testolin v. Thirty-One Bar Ranch Co.*, 2024 WY 6, ¶ 15, 541 P.3d 455, 460 (Wyo. 2024)). The interpretation of a lease agreement presents a question of law which we review de novo. *PNS Stores, Inc. v. Cap. City Props., LLC*, 2022 WY 101, ¶ 20, 515 P.3d 606, 611 (Wyo. 2022) (quoting *Larson v. Burton Constr., Inc.*, 2018 WY 74, ¶ 16, 421 P.3d 538, 544 (Wyo. 2018)).

## DISCUSSION

[¶14] The district court awarded damages to the Coopers and Dace in the amount of $153,772.05 because the Crouches failed to provide the Coopers with adequate notice of default and an opportunity to cure. On appeal, the Crouches claim they provided the required notice and an opportunity to cure, and the district court erred by not considering certain evidence when it ruled on their first-to-breach affirmative defense. They also challenge the district court's award of damages. We address each argument in turn.

### I.    The Crouches failed to give the Coopers the required written notice of default and an opportunity to cure any alleged breach as required by the Lease.

[¶15] The district court held the Crouches breached the Lease "by terminating the agreement without both giving written notice and providing [the Coopers with] 90 days to cure any deficiency." The Crouches argue the district court erred because the letter they sent in November 2020 provided the Coopers "with over 90 days to cure their defaults." They argue the November 2020 letter coupled with the Lease provided the Coopers with the requisite notice and an opportunity to cure.

[¶16] Our ultimate goal when interpreting the Lease is to determine the intent of the parties to the document. *W. Am. Ins. Co. v. Black Dog Consulting Inc.*, 2023 WY 109, ¶ 20, 538 P.3d 973, 979 (Wyo. 2023). "When the language of the lease is clear and unambiguous, we look only to its four corners to determine the parties' intent." *Id.* We read the Lease as a whole, with the objective of finding a reasonable construction, which does not render any provision meaningless. *Scherer, II v. Laramie Reg'l Airport Bd.*, 2010 WY 105, ¶ 11, 236 P.3d 996, 1002 (Wyo. 2010) (quoting *Brown v. Johnston*, 2004 WY 17, ¶¶ 23, 25, 85 P.3d 422, 429–30 (Wyo. 2004)). We give the language of the Lease the "meaning which the language would convey to reasonable persons at the time and place of its use." *N. Silo Res., LLC v. Deselms*, 2022 WY 116A, ¶ 15, 518 P.3d 1074, 1081 (Wyo. 2022) (citing *BNSF Ry. Co. v. Box Creek Min. Ltd. P'ship*, 2018 WY 67, ¶ 20, 420 P.3d 161, 166 (Wyo. 2018)).

[¶17] The notice requirement in paragraph eight of the Lease provides: "[d]efault of any of the above provisions by either party may be cured upon written notice by the other party

6

within 90 days of receipt of such notice." The notice requirement is clear and unambiguous and must be enforced as written. *See Kinstler v. RTB S. Greeley, Ltd. LLC*, 2007 WY 98, ¶ 8, 160 P.3d 1125, 1128 (Wyo. 2007). Pursuant to the terms of the Lease, the Crouches were required to provide the Coopers with written notice of any alleged default and an opportunity to cure any default within 90 days of receipt of the written notice. *See id.*

[¶18] The November 2020 letter the Crouches' attorney sent to the Coopers and Dace stated: "This letter will serve to inform that the Lease will be terminated effective February 15, 2021, however, you may leave your cattle on the pasture until March 31, 2021." It informed the Coopers "[t]he termination of the lease is the result of [their] breach of the most essential terms of the lease that is, that [they] 'employ standard best management practices.'" The November 2020 letter informed the Coopers what conduct the Crouches thought violated "standard best management practices," but it never provided the Coopers with any meaningful opportunity to cure those alleged violations prior to terminating the Lease. Instead, the November 2020 letter informed the Coopers they had to vacate the leased property by a certain date.

[¶19] Based on this November 2020 letter, the district court found the Crouches never gave the Coopers an opportunity to cure any alleged breach. The Crouches argue that although the November 2020 letter does not explicitly give the Coopers 90 days to cure, the underlying contract notified the Coopers of their ability to cure. Giving the Coopers every reasonable inference, the district court's finding is supported by the record. *See Koch*, 2024 WY 41, ¶ 10, 546 P.3d at 1099 (quoting *Testolin*, 2024 WY 6, ¶ 15, 541 P.3d at 460).

[¶20] The Coopers interpreted the November 2020 letter to mean they "were being kicked off" the Crouches' farm. In an attempt to remedy the alleged default, Kerry contacted the Crouches' attorney, as directed by the letter, and attempted to negotiate keeping the Lease for the last year to ensure he had feed for his cattle. Instead of providing the Coopers with an opportunity to cure the alleged default, the Crouches referred the Coopers to their attorney. The Coopers' attorney sent correspondence to the Crouches' attorney along with the first installment of the 2021 lease payment opining there was nothing in the November 2020 letter "that justifies termination of the lease." In response, the Crouches' attorney returned the payment and sent a letter stating:

> Mr. and Mrs. Crouch gave Mr. and Mrs. Cooper ninety days advance notice of their termination of the lease which is effective 2-15-2021. Therefore, Mr. and Mrs. Crouch will not accept the check from Mr. and Mr[s]. Cooper, and I have enclosed the same with this letter. As noted in my earlier letter to Coopers terminating the lease, they are permitted to leave their cattle on the pasture until March 31, 2021.

7

[¶21] The purpose of the notice requirement in the Lease was to inform the Coopers of any alleged default, why the Crouches were taking such action, and how the Coopers might remedy the alleged default within 90 days. *See Ahearn v. Hollon*, 2002 WY 125, ¶ 18, 53 P.3d 87, 91 (Wyo. 2002); *Kost v. First Nat'l Bank of Greybull*, 684 P.2d 819, 823 (Wyo. 1984). A notice of default should be detailed enough to inform the defaulting party how to cure any alleged default and remedy the problem. *Ahearn*, ¶¶ 18–22, 53 P.3d at 91–92. If a party to the contract is unaware of how to correct an alleged default, they are forced to engage in a "meaningless guessing game" at the discretion of the other party to the contract. *Gallagher v. Borden, Inc.*, 616 N.E.2d 577, 579 (Ohio Ct. App. 1992). The more detailed the notice of default, the more likely the defaulting party is provided a reasonable and meaningful opportunity to cure. *See generally Lindner v. Meadow Gold Dairies, Inc.*, 515 F. Supp. 2d 1166, 1173 (D. Haw. 2007) (holding the notice of default provision in the lease required the lessor to provide notice specifying the performance defects and giving the lessee a meaningful opportunity to cure before terminating the lease); *see also Deffenbaugh Indus., Inc. v. Unified Gov't of Wyandotte Cnty., Kansas City, Kansas*, No. 22-3147, 2023 WL 4363439, at *19–20 (10th Cir. July 6, 2023) (finding notice to cure provisions contain an implicit requirement to give the lessee enough detail to cure the alleged default).

[¶22] The November 2020 letter failed to provide the Coopers with any meaningful opportunity to cure the alleged default. Instead, the November 2020 letter specifically terminated the Lease without any possibility of curing the alleged default. Additionally, the Crouches rejected the Coopers' initial payment for the 2021 farming season. The Crouches' letters and actions left the Coopers engaging in a meaningless guessing game as to how they could cure any alleged default, and instead led them to believe they were being kicked off the property and needed to obtain alternative feed and pasture for their cattle. Based on these circumstances, the district court did not err when it found the Crouches failed to comply with the notice of default and right to cure requirements under the Lease.

## II. The Crouches cannot rely on the first-to-breach affirmative defense to excuse their failure to provide the required notice and an opportunity to cure.

[¶23] In their second issue, the Crouches raise a first-to-breach affirmative defense, which generally allows one party's material breach to excuse the other party's performance under the agreement. *Koch*, 2024 WY 41, ¶ 12, 546 P.3d at 1100 (quoting *Maverick Benefit Advisors, LLC v. Bostrom*, 2016 WY 96, ¶¶ 14–15, 382 P.3d 753, 758 (Wyo. 2016)). The Crouches claim "[t]he Coopers materially breached the lease by failing to employ standard best management practices as defined by the contract, the parties' dealings, and the industry standard, and therefore, [they] did not have to provide [the Coopers] with the exact language saying they had 90 days to cure in the notice of default." The Crouches argue the district court should have considered extrinsic evidence and determined the Coopers materially breached the Lease by failing to use "standard best management practices." They claim if the district court had considered the evidence, it would have found the

8

Coopers materially breached the Lease, which excused them from providing the requisite notice. The Crouches' argument is misplaced.

[¶24] "When a party fails to provide notice of a material breach, if required by the terms of the lease, reliance on that breach to excuse contractual performance is improper." *Kinstler*, 2007 WY 98, ¶ 8, 160 P.3d at 1128. In *Kinstler*, the tenant claimed he was excused from paying rent under the terms of the lease because the landlord materially breached the lease by failing to provide the required landscaping. *Id.* at ¶ 7, 160 P.3d at 1127. The district court found the tenant could not rely on any alleged breach by the landowner to excuse his performance because he never provided written notice to the landlord as required under the terms of the lease. *Id.* We upheld the district court's decision and found the landlord's material breach was irrelevant because the tenant failed to provide the landlord with the requisite notice of default. *Id.* at ¶¶ 8–9, 160 P.3d at 1128. We found whether or not the landlord's alleged breach of the lease was material, the tenant could not rely on it "because he failed to comply with the [l]ease's notice requirement." *Id.* at ¶ 9, 160 P.3d at 1128.

[¶25] Like the tenant in *Kinstler*, the Crouches failed to comply with the Lease's notice requirements. The Crouches cannot rely on any alleged material breach by the Coopers to excuse their failure to provide the Coopers with adequate notice and an opportunity to cure. *Id.* at ¶¶ 8–9, 160 P.3d at 1128. Accordingly, issues relating to consideration of extrinsic evidence regarding the Crouches' alleged first-to-breach theories are irrelevant, and do not merit further discussion.

### III. The damages awarded by the district court were foreseeable and reasonably proven by the Coopers. However, the district court clearly erred when it accounted for the costs of the pasture leases twice.

[¶26] In an action for breach of contract, the legal remedy is an award of damages designed to place the plaintiff in the same position as if the contract had been fully performed, less proper deductions. *Hanft v. City of Laramie*, 2021 WY 52, ¶ 42, 485 P.3d 369, 383 (Wyo. 2021); *Legacy Builders, LLC v. Andrews*, 2014 WY 103, ¶ 17, 335 P.3d 1063, 1068 (Wyo. 2014). "Damages for a breach of contract may include recovery for incidental or consequential loss caused by the breach, as long as such damages are a foreseeable result of the breach." *Legacy Builders,* ¶ 36, 335 P.3d at 1072. The Coopers had "the burden of producing evidence to prove [their] damages[.]" *Summit Constr. v. Koontz*, 2024 WY 68, ¶ 26, 550 P.3d 106, 114 (Wyo. 2024) (quoting *Gill v. Lockhart*, 2022 WY 87, ¶ 34, 512 P.3d 971, 981 (Wyo. 2022)).

[¶27] The Crouches claim the Coopers failed to provide sufficient evidence to support their damages. Specifically, they argue the damages awarded to the Coopers should have been for their lost profits, if any, and not the amounts they expended for feed or lost hay sales. They also claim the costs the Coopers sought were not supported by documentation.

[¶28] "Whether the district court employed the proper methodology or legal standard to calculate the damages award is an issue of law, which we review de novo." *Morningstar v. Robison*, 2023 WY 28, ¶ 26, 527 P.3d 241, 249 (Wyo. 2023) (quoting *Halling v. Yovanovich*, 2017 WY 28, ¶ 28, 391 P.3d 611, 621 (Wyo. 2017)). The district court's damages calculation is a question of fact, which we will only reverse if the findings are clearly erroneous. *Halling*, ¶ 28, 391 P.3d at 621; *Ruby Drilling Co., Inc. v. Duncan Oil Co., Inc.,* 2002 WY 85, ¶ 29, 47 P.3d 964, 973 (Wyo. 2002).

[¶29] The Coopers entered into the Lease with the Crouches for the purpose of growing hay and grazing cattle on the Crouches' property. The five-year term of the Coopers' Lease with the Crouches was set to expire on February 15, 2022. Each year the Coopers would pasture their cattle on the Crouches' property from approximately mid-November until mid-February where their cattle would forage and eat the hay grown there. The Coopers would then move the cattle to other property from approximately mid-February to May 8th, where they would feed their cattle the hay they produced on the Crouches' property. Dace would provide labor and the use of his equipment to farm the Crouches' property, and in exchange he would receive any excess hay over 600 bales.

[¶30] Because the Crouches terminated the Lease early and the Coopers could not grow hay during the summer of 2021, the district court found the Coopers were required to obtain feed for their cattle from February 15, 2022, to May 8, 2022. The district court also found the Coopers were unable to use the Crouch property for pasture from November 1, 2021, to February 15, 2022, which forced them to purchase other feed and supplements. The district court determined the Coopers incurred trucking costs to haul the purchased feed along with costs to lease other property for pasture. It held the Coopers incurred costs for feed, supplements, trucking, and replacement pasture as a result of the loss of the Lease in the amount of $178,676.05. However, because Dace sold some leftover hay after the lease was terminated, the district court found the Coopers could have mitigated their damages by using that hay, so it reduced their damages award by $24,650.35, the amount Dace received from the sale of the hay. Finally, the district court reduced the damages awarded by the expenses the Coopers avoided by no longer operating the Crouches' property in 2021, which Kerry testified was $28,000.00. Combining the sale of hay anticipated for 2021 with the costs for feed, supplements, trucking and pasture, and then reducing that amount by the anticipated 2021 expenses, the district court found the total amount of damages the Coopers reasonably proved was $153,772.05. Below is a table depicting the district court's finding of the amount the Coopers would have avoided, as well as made from the sale of hay, had the Lease been fully performed:

10

| Damages Awarded | |
|---|---:|
| Costs for Feed | $134,393.15 |
| Trucking Costs | $27,003.70 |
| Pasture Lease | $2,660.60 |
| Supplements | $14,618.60 |
| **Total Costs** | **$178,676.05** |
| Less Hay Sold After Termination | $24,650.35 |
| | $154,025.70 |
| Plus Excess Hay Anticipated for 2021 | $27,746.35 |
| | $181,772.05 |
| Less Anticipated Expenses for 2021 | $28,000.00 |
| **TOTAL DAMAGES** | **$153,772.05** |

[¶31] Although damages must be proven to a reasonable degree of certainty, "proof of exact damages is not required." *WSP, Inc. v. Wyo. Steel Fabricators & Erectors, Inc.*, 2007 WY 80, ¶ 19, 158 P.3d 651, 655 (Wyo. 2007). Additionally, although lost profits are a measure of damages, they are merely one possible measure. *Id.* at ¶ 21, 158 P.3d at 655. Damages for the Crouches' breach should compensate the Coopers for any loss in value, plus any loss, including incidental or consequential loss, caused from the breach of the Lease, less any cost they avoided by not having to perform under the Lease. *G.C.I., Inc. v. Haught*, 7 P.3d 906, 911 (Wyo. 2000) (quoting *JBC of Wyo. Corp. v. City of Cheyenne*, 843 P.2d 1190, 1195 (Wyo.1992)).

[¶32] The damages awarded by the district court were reasonably foreseeable, and the Coopers reasonably proved those damages. The Coopers supported the costs they expended for feed, supplements, and pasture for the year they were unable to farm and graze their cattle on the Crouches' property with invoices, bills of lading, bank statements, checks or duplicate checks. The Coopers also showed by a spreadsheet, marked as Exhibit 5, how they calculated the trucking costs and explained during Kerry's testimony how the trucking costs were calculated, including the costs for Dace's labor to transport the hay.

[¶33] We have reviewed the evidence the Coopers submitted in support of their request for damages, and while we find no clear error in the district court's reliance on those documents to calculate damages, or the methodology the district court used to arrive at its damages calculation, we do find the district court erred by including in its award the costs the Coopers expended on pasture leases twice. Our review of the Coopers' spreadsheet and all documents supporting the amounts they expended on feed, trucking, supplements and pasture, reveals the district court's award is $2,660.60 greater than the amount supported by the record. This amount is the exact amount the Coopers expended on leasing replacement pasture. The evidence before us indicates the district court not only accounted for the costs of the replacement pasture separately, but it also included this amount in its calculation of the costs for supplements. Below is a table of the calculations we arrive at

11

by adding up the Coopers' evidence supporting their costs for feed, supplements, trucking, and pasture, then reducing that amount by the anticipated 2021 expenses, and accounting for any anticipated hay sales for 2021.

| Damages Awarded | |
|---|---|
| Costs for Feed | $ 134,393.15 |
| Trucking Costs | $ 27,003.70 |
| Pasture Lease | $ 2,660.60 |
| Supplements | $ 11,958.00 |
| **Total Costs** | **$ 176,015.45** |
| Less Hay Sold After Termination | $ 24,650.35 |
| | $ 151,365.10 |
| Plus Excess Hay Anticipated for 2021 | $ 27,746.35 |
| | $ 179,111.45 |
| Less Anticipated Expenses for 2021 | $ 28,000.00 |
| **TOTAL DAMAGES BASED ON RECORD** | **$ 151,111.45** |
| District Court Damage Finding | $ 153,772.05 |
| Difference in Findings | **$ (2,660.60)** |

[¶34]  Based on the evidence in the record, we are left with a firm conviction the district court accounted for the costs of the pasture leases twice, and therefore we remand to the district court with instructions to reduce its damages award by $2,660.60. *See generally Legacy Builders,* 2014 WY 103, ¶¶ 38–39, 335 P.3d at 1072 (remanding a damages award to the district court with instructions to reduce the award based on the evidence in the record).

### IV.   *The district court's reduction of damages by $24,650.35 for the Coopers' failure to mitigate damages is supported by the record.*

[¶35]  In their final issue, the Crouches claim the district court's damage award should be further reduced by the amount of hay the Coopers sold sometime in the fall of 2020, $2,340.00, as well as approximately $30,000 in trucking costs for a lease Dace willingly gave up on another piece of property.  "It is . . . well established that one who is injured by the wrongful act of another must exercise reasonable care and diligence to minimize the resulting damage." *Hacker Oil, Inc. v. Hacker*, 2024 WY 3, ¶ 11, 540 P.3d 1187, 1189 (Wyo. 2024) (quoting *Asbell Bros., Inc. v. Nash-Davis Mach. Co.*, 382 P.2d 57, 59 (Wyo. 1963)).  The doctrine of mitigation of damages, sometimes called doctrine of avoidable consequences, requires the injured party to use reasonable diligence and ordinary care to attempt to minimize his damages after the breaching party inflicted injury. *Id.* at ¶ 12, 540 P.3d at 1189 (quoting *UNC Teton Expl. Drilling, Inc. v. Peyton*, 774 P.2d 584, 592 (Wyo. 1989)).  Mitigation of damages "is an affirmative defense to reduce the amount of damages a plaintiff is entitled to after liability has been found." *Id.* at ¶ 13, 540 P.3d at 1190.  While the Coopers carried the initial burden of proving damages, it is the Crouches who must

establish what they assert requires mitigation or reduction of damages. *Legacy Builders,* 2014 WY 103, ¶ 27, 335 P.3d at 1070.

[¶36]   The Crouches allege the district court should have deducted from its calculation the proceeds from the hay from the Crouches' property that Dace sold in the fall of 2020, which amounted to $2,340.00.   The Crouches did not terminate the lease until November 11, 2020.  The Crouches did not establish, nor do they point us to any evidence in the record, establishing the Coopers sold this hay after the Crouches terminated the Lease.   The requirement to mitigate damages begins when the injury occurs and damages are accumulating. *Hacker Oil,* 2024 WY 3, ¶ 13, 540 P.3d at 1190 (quoting *Reed v. Aaacon Auto Transp., Inc.*, 637 F.2d 1302, 1305 (10th Cir. 1981), *overruled on other grounds by Underwriters at Lloyds of London v. N. Am. Van Lines*, 890 F.2d 1112 (10th Cir. 1989)); *see also Deisch v. Jay*, 790 P.2d 1273, 1278 (Wyo. 1990).  The district court did not clearly err when it declined to reduce its award of damages by the $2,340.00 for Dace's hay sales in the fall of 2020.

[¶37]   During the same time the Coopers leased the Crouches' property, Dace individually leased a piece of property that he used to grow barley hay.  Dace leased the property for approximately 13 years, but in February or March 2021, he and the landowner mutually agreed to terminate the lease.  The Crouches claim the district court's award of damages should be reduced by $30,000.00 in trucking costs because Dace willingly gave up his lease on this property after the Crouches terminated the Lease.  They argue "Dace Cooper had a duty to mitigate damages and try to provide as much hay as he could for [his parent's] cattle" because he knew his parents were losing the Lease with the Crouches.  The evidence in the record establishes that Dace never signed the Lease with the Crouches, nor did he sign the amendment to the Lease.  The Crouches never introduced Dace's lease for the separate property, nor did they present any evidence the Coopers ever purchased any hay from that separate lease, the amount of hay that the lease produced, or the costs the Coopers could have saved had they paid Dace for the hay on his other lease.  "A court may not resort to speculation or conjecture in determining the proper amount to award." *Summit Constr.*, 2024 WY 68, ¶ 26, 550 P.3d at 114 (quoting *Gill*, 2022 WY 87, ¶ 39, 512 P.3d at 982).  The Crouches failed to meet their burden of establishing the damages award should have been reduced based on Dace mutually agreeing with a different landowner to end a separate lease not associated with his parents' cattle operation.  Therefore, any mitigation of damages would be speculative and improper.  The district court did not err by declining to reduce the damages award based on Dace's decision to discontinue leasing a separate property.

## CONCLUSION

[¶38]   The district court did not err when it found the Crouches breached the Lease by failing to give the Coopers the required notice and a reasonable opportunity to cure any alleged default.  Because the Crouches failed to give adequate notice and an opportunity to

cure, they cannot rely on the first-to-breach affirmative defense to excuse their failure to comply with the notice requirement. The district court did not err in its method for calculating damages, or by only reducing its damage award in the amount of $24,650.35 for the Coopers' failure to mitigate. However, the record reveals the district court accounted for the Coopers' costs to lease replacement pasture twice. Therefore, we remand to the district court with instructions to reduce its damages award by $2,660.60. We affirm the district court's decision in all other respects.